Filed 8/19/22  P. v. Jones CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>WALTER MORRIS JONES,<br><br>　　　Defendant and Appellant. | B307648<br><br>(Los Angeles County<br>Super. Ct. No. BA455301) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas Sortino, Judge.  Affirmed.

　　　Valerie G. Wass for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

During the trial of Walter Jones for murder, multiple discovery violations committed by either the prosecution or investigating agencies came to light, resulting in the trial court instructing the jury with CALCRIM No. 306 regarding late discovery but denying defense motions for dismissal and mistrial. The jury convicted Jones of murder with gun and gang enhancements. On appeal, Jones contends that his conviction must be reversed because the trial court should have granted his motions to dismiss and for a mistrial based on the discovery violations. We disagree that the trial court erred and accordingly affirm the judgment.

## BACKGROUND

I.    The murder of Tyrone Golden

Jones and James Williams were jointly tried for the murder of Tyrone Golden. The prosecution's theory was that Jones was the shooter, Williams was the getaway driver, and the murder was in retaliation for the murder of a fellow gang member.

The fellow gang member was Clayton Ross, known as Red Bang. On March 12, 2015, Ross was shot and killed at a store on Hoover and Century. Members of the Underground Crips were arrested in connection with Ross's murder.

Just weeks after Ross was killed, Golden was killed on the morning of March 31, 2015. The morning that Golden was murdered, gunshots woke Miguel Rosales, who was at his home in the general area of 10114 South Budlong Avenue in Los Angeles. Looking out his window, Rosales saw Golden on the ground. Rosales also saw a man wearing jeans and a grey hoodie running to a white van with paper license plates. The man left in

the van, although Rosales could not tell whether he entered through the front or rear passenger door.[1]

Paramedics arrived at 8:40 a.m. and determined that Golden, who had been shot in the back of the head, was dead. Four 9-millimeter casings fired from one gun were recovered from the crime scene.

The same day Golden was murdered, Deputy Sheriff Nicholas Adragna was investigating an unrelated crime. While visiting a location related to that crime, Deputy Adragna saw the van involved in Golden's murder parked in a spot assigned to an apartment at 841 West 101st Street. Officers searched the van and found live ammunition (including nine millimeter), a credit card bill belonging to Latasha Acrey, a cell phone, and a gun.

The gun found in the van, however, was not the one used to kill Golden. The van was registered to Kentoya Mitchell, who was Williams's girlfriend. Email account ratneckw@gmail.com was associated with the cell phone found in the van, and a video of Williams was extracted from the phone. Latasha Acrey was the girlfriend of Clevon Stringer, who sometimes lived at 841 West 101st Street.

Jones's palm print was on a piece of paper recovered from the van. Two other prints from the van were inconclusive as to Jones and Williams.

---

[1] Rosales drew a map of the area in front of his house but the interviewing detective failed to attach the drawing to her report.

II.    Gang evidence

The parties stipulated that Hoover Criminals is a criminal street gang. Its territory encompasses an area west of the 110 Freeway and extends north and south. A gang expert testified that Hoover Criminals has nine sets, including the 107's and 11 Deuce. Hoover Criminals' main rivals include 10 Deuce and Underground Crips. The gang expert believed that the victim, Golden, was an Underground Crips gang member, and a member of the 10 Deuce Budlong set of the Rollin' 100's. The gang expert also knew Jones, who had identified himself as a 112 Hoover gang member with a moniker of Little No Good.

III.   Evidence from Clevon Stringer

Several months after Golden's murder, Detective Erik Shear arrested Stringer[2] on drug charges unrelated to this case. In the course of talking to Stringer, the detective learned that Stringer might have information about Golden's murder and relayed that information to Detective Michael Rodriguez, the officer investigating Golden's murder. Detective Rodriguez interviewed Stringer, who was in custody on the drug charges. That recorded interview was played for the jury.

At the interview's outset, Detective Rodriguez told Stringer he was not in a position to make promises; rather, what "I do is I take my information, I verify the information and then I can go to somebody at the district attorney's office and say this is what I have." "Can I put in a recommendation? Absolutely. But I am not the person that decides that."

---

[2] Stringer was from the 107th set of the Hoover gang with a moniker of Monster.

Stringer said he used to stay at 841 West 101st Street, and his family still lived there.  Stringer then told the detective that one morning, at about 10:00 or 11:00 a.m., "No Good" (Jones) came to the house at 841 West 101st Street to buy drugs.  No Good said that he "got me one . . . I just got a 10-Deuce Budlong." No Good explained that earlier that morning he and Ratneck (Williams)[3] were "driving around trying to" retaliate against the guy who killed Red Bang.  They drove by 102nd and Normandie and saw an "old guy walking," so they asked where he was from. When the man said he was from 10 Deuce Budlong, No Good "hopped out of the van, pop, pop, pop and hopped back in the car and drove off, parked the car in a store, came over to my house," bragging about having just killed the man.  No Good said that Ratneck was the driver.  Stringer clarified that No Good was from 11 Deuce Hoover and was the "trigger."  No Good stashed the gun in a tire in the alley at the back of Stringer's house.[4] They put ammunition in the van.  When they saw cops pulling up outside of Stringer's house, they escaped through the back.

At the end of the interview, Stringer talked about his pending charges and what sentence he might get for them. Detective Rodriguez told him, "we'll explore the options, okay, and we'll see what, what's um—now just because something doesn't get done, you know, before you go back to court does not mean something is not going to get done.  Alright?"

---

[3] Williams has a tattoo of a rat on his neck, with the word "neck" beneath the rat.

[4] No gun was recovered.

Stringer thereafter testified at a preliminary hearing, and that testimony was also read to the jury.[5] He testified that in July 2015, he was in custody for selling drugs. At that time, Detective Rodriguez asked Stringer about the white van and a murder. Stringer told him that word on the street was Scandalous might have been involved. Although Stringer said he knew Williams and Jones, he denied telling Detective Rodriguez that Jones had asked the victim where he was from, the victim said he was 10 Deuce Budlong, and Jones shot the victim. In short, he denied recalling anything he had said in his July 2015 interview.

However, Stringer did admit he had convictions for theft-related offenses, possession for sale, felon in possession of a firearm, assault with a deadly weapon with great bodily injury, and for sale or transportation of a narcotic.

Stringer also said that he interpreted statements Detective Rodriguez made about where Stringer would be most comfortable as meaning the detective could influence where Stringer was housed in jail. And when Detective Rodriguez asked Stringer if he was going to court the next day, Stringer understood that his time would be reduced and he would be paid.

In fact, after Stringer testified at the preliminary hearing, Detective Rodriguez enrolled Stringer in a witness relocation program and, over a several-months period, gave Stringer $5,760 in cash for housing and food.

---

[5] The preliminary hearing testimony was read to the jury after Stringer invoked his Fifth Amendment rights and the trial court found he was unavailable as a witness.

IV.    Cell phone and wiretap evidence

Agent Michael Easter, an expert in cell site analysis, reviewed cell phone records for numbers associated with Williams and Jones. Around the time Golden was killed, the cell phones were in the general area of the crime scene.

Law enforcement wiretapped a phone associated with Jones. In December 2015, Jones[6] called Reggie Cole, who told Jones that "[t]hey just hit lady bone house looking for you and Ratneck about some homicide on" 101st. Jones asked why they would do that, and Cole said he did not know why but "maybe that's what Ratneck ran from last time" and the police were "just doubling back." Jones said that Ratneck was on the run "because when they got groove with the blower, nigga they came and hollered at groove about that."[7] They were putting the "squeeze back on groove" and he was the only person "got caught up." Cole asked Jones if "they" knew about him because of fingerprints, and Jones said, "Nope. Because if they had that, they wouldn't need no sketch," possibly referring to a flier police had distributed about Golden's murder. Cole told Jones to "stay low."

After this call, law enforcement distributed in January 2016 a flier with Jones's and Williams's photographs and a photograph of a white van. The same day the flier was distributed, Jones called an unidentified male, who told Jones that his "pad" had been "hit" that day and told Jones about the flier. The man told Jones that somebody was talking, and Jones said, "He lied" and "groove, from the gate, like, this nigga done liked. Like, he the one that like um did all of this." Jones said,

---

[6] Detective Rodriguez testified that he recognized Jones's voice.

[7] Groove may be used as a term of endearment or as a verb.

"He's wrong, bro. He's wrong for the simple fact bro. It's only me and him bro. There ain't anybody else." "I'm saying on the situation that they looking for, it's no else bro, at all." "Like it was only me and him bro. I'm talking about this situation."

## V.     Verdict and sentence

A jury found Jones guilty of first degree murder (Pen. Code,[8] § 187, subd. (a)) and found true personal gun use (§ 12022.53, subd. (d)) and gang (§ 186.22, subd. (b)(1(C)) allegations. On September 2, 2020, the trial court sentenced Jones to 25 years to life doubled to 50 years to life based on a prior strike plus 25 years to life for the gun enhancement.

The jury acquitted Williams of first and second degree murder.[9]

## DISCUSSION

Either the prosecution or law enforcement agents committed at least five discovery violations, which resulted in the trial court instructing the jury with CALCRIM No. 306. After describing the events surrounding those discovery violations and setting forth general principles of discovery in criminal matters, we find that the trial court did not err by refusing either to dismiss the charges or to grant a mistrial.

---

[8] All further undesignated statutory references are to the Penal Code.

[9] Mitchell, Williams's girlfriend, was also tried with Williams and Jones, but during trial she pleaded guilty to being an accessory after the fact.

I.      The discovery violations and dismissal and mistrial motions

The five discovery violations concern: (1) the untimely disclosure of a cell phone data analysis report, (2) that Stringer was given relocation funds, (3) the involvement of a surveillance team, (4) a deputy's failure to turn over diagrams of the crime scene, and (5) a fingerprint ruse. Based on these discovery violations, defense counsel made various motions to dismiss the charges and for a mistrial, all of which we detail below.

A. *Cell phone data analysis report*

Part of the prosecution's strategy was to show that cell phones associated with defendants were in the area of the murder around the time it occurred. Pertinent to that, the prosecution timely disclosed raw cell phone data[10] and a related report. Then, after defense counsel had announced ready for trial and within just weeks of the February 2019 trial, the prosecution disclosed a report analyzing the data and placing Jones in the vicinity of the crime scene shortly before the murder. Even though prosecutors had the report in May or June 2018, it was not timely disclosed because, in the prosecutor's words, it "got lost in the shuffle." Also, the prosecution forgot to distribute and file its expert designation, leading the defense to believe that the evidence would not be used.

In response to the trial court's query whether the matters timely disclosed gave the defense notice that the prosecution would try to place Jones within a mile of the crime scene about five or six minutes after the murder, defense counsel pointed out that all he knew is "some detective had a theory," but he did not

---

[10] Printed, the data was about 100,000 pages.

9

know the details of how it was prepared or who would testify about it. Further, the newly disclosed report had information placing Jones near the Imperial Highway and Normandie cell tower in the vicinity of the crime scene shortly *before* the murder, which, in the trial court's estimation, was "not an insignificant addition." The trial court further noted that if Jones did not have an explanation for being in the area around the time of the murder, that was "critical evidence against him. It's good circumstantial evidence."

Williams's counsel said the late disclosure prejudiced him because when he announced ready for trial, the prosecution had not included an expert. Thinking the evidence would therefore not be used, counsel let his expert go to work on other cases. Jones's counsel similarly represented that he announced ready based on the state of the evidence at that time.

The trial court, while "not happy" about the situation, said it was not a malicious and deliberate choice to withhold the report, even as it acknowledged that the late disclosure put the defense at a disadvantage. Williams's counsel agreed that the discovery violation wasn't done purposely, so while he was not asking for dismissal (which the trial court said it would not grant), he was asking that the evidence be excluded, or that the trial court find the prosecutors in contempt and give CALCRIM No. 306, because he had not talked to his expert about the new matter, so now he was "scrambling."

In ruling, the trial court found that there had been a discovery violation but that it was not willful because the report had just "fall[en] through the cracks." That being the case, the trial court declined to exclude the evidence, because doing so would hinder the search for truth. However, the trial court was

10

willing to grant a continuance and added that if defense counsel wanted to proceed, the trial court would consider instructing the jury on late discovery.[11]

All counsel said they were ready to proceed with trial.[12] Jones's counsel represented he had considered the offer of a continuance but was prepared to go forward, that he had discussed the issue with his client, and that he could adequately represent his client on the current state of the record. Jones's counsel added that his agreement to proceed was based on, among other things, the trial court's statement it would accommodate scheduling the defense experts, that his client wanted to proceed, and that he did not feel the nature of the case would change during a continuance.

B. *Evidence Stringer was given relocation funds after the preliminary hearing*

During trial, prosecution witness Stringer was arrested on drug charges, and so the defense indicated it would want to cross-examine him about that arrest and about any promises made to him in that case for his testimony against the defendants in this case. Then, when it became clear Stringer would assert his Fifth Amendment rights not to testify in this case, the prosecution asked that Stringer's preliminary hearing testimony be admitted.

Defense counsel for Williams responded with a concern that *after* Stringer had testified at the preliminary hearing, counsel

---

[11] The trial court also pointed out that if it excluded the evidence, the prosecution could dismiss the case and refile it, delaying the case further, when at least Williams personally wanted to proceed with trial.

[12] Jones's counsel initially asked for a continuance but withdrew that request after considering the matter overnight.

discovered that Detective Rodriguez had said things to Stringer having an "undertone" of suggesting he could help Stringer. Counsel thus referred to a second interview the detective had with Stringer in which the detective asked if "Erik" got a hold of him—referring to Detective Shear, who had arrested Stringer on his most recent drug charges. Counsel for Jones added that Stringer had been given relocation funds *after* he testified at the preliminary hearing and therefore had not been cross-examined about that. The prosecutor represented that once defense counsel told her that Stringer had been relocated, she asked a lieutenant to look into the matter, as the district attorney's office had not been told about the relocation funds.

The trial court had Detectives Rodriguez and Shear testify at an Evidence Code section 402 hearing. At that hearing, Detective Rodriguez testified that Detective Shear had told him that Stringer might have information about Golden's murder, so Detective Rodriguez interviewed Stringer, first in July 2015 and a second time in August 2015.[13] During the first interview, Detective Rodriguez told Stringer, who was in custody, he could not make any promises regarding Stringer's pending criminal matters. The detective denied helping Stringer, including speaking to anyone else about helping Stringer. However, Detective Rodriguez confirmed that when he spoke to Stringer, the detective knew that Stringer was going to court in a few days on the drug charges, so he told Stringer that he had told Detective Shear to "call the attorney, whatever, you know, that you were, you know, to give a consideration on, you know, for helping out." Immediately after the preliminary hearing, the

---

[13] Both interviews were recorded but only the first was introduced at the preliminary hearing.

detective obtained relocation funds for Stringer, who was ultimately given $5,760 in assistance over several months.

Detective Shear next testified at the 402 hearing. Detective Shear testified that Stringer was a defendant in a case he was investigating, but that case was unrelated to Golden's murder. In the course of that investigation, Stringer told him things about that murder, so Detective Shear passed this information to Detective Rodriguez. However, Detective Shear denied doing anything to get Stringer leniency in any of his cases. He also denied that Detective Rodriguez told him to talk to an attorney to get Stringer consideration for helping out.

Also at the 402 hearing, the trial court reviewed an informant package and reported that a Detective Derek White had signed up Stringer as an informant after catching Stringer with ammunition.

After reviewing all relevant matters, the trial court found that the defense had ample opportunity to cross-examine Stringer at the preliminary hearing about any interactions with Detective Shear. It was also then clear that Stringer was in trouble with other cases, so the defense at the preliminary hearing cross-examined him about making things up to get out of his cases.

Counsel for Williams, however, maintained that his opportunity and motive to cross-examine Stringer at the preliminary hearing was not the same as at trial. Counsel for Jones expressed concern about the relocation funds Stringer received after the preliminary hearing, although the trial court pointed out that it would not have affected Stringer's preliminary hearing testimony.

Williams's counsel moved for a mistrial on the ground he did not have an opportunity to cross-examine Stringer. The trial court indicated it would deny the motion but directed the prosecutor to have Detective Shear review any file he had regarding Stringer. Detective Shear returned to court with the file and testified again that he had never asked Stringer to be an informant and, as far as he knew, Stringer was not an informant for anyone else. The detective also denied asking that Stringer receive any consideration, and he had verified that no payments had been made to Stringer from an account used to pay informants.

C. *Evidence about a surveillance team*

On the same morning Golden was killed, law enforcement happened to be surveilling Stringer's house at 841 West 101st Street because they believed that a suspect in another crime, Edward Rachal, was at the house. At about 10:00 a.m. (several hours after Golden had been killed), they arrested Rachal when he ran out of the house with four other Black men. Deputy Adragna, who was investigating Rachal, went to the house later that morning or early afternoon, and, while there, saw a van resembling the one reportedly involved in Golden's murder. Deputy Adragna alerted the officers investigating Golden's murder about the van.

This evidence came out before the jury, but it was not until cross-examination that the defense learned Deputy Adragna was not part of the team surveilling the house but had instead arrived at the house at about noon or 2:00 p.m., hours after Rachal was arrested. Therefore, the deputy did not see the four men who had run out of the house and who were not arrested, and he could not speak to any timeline about when the surveillance occurred and

14

when the van might have arrived at the house. Moreover, the deputy did not know who was on the surveillance team.

At this point, Williams's counsel moved for a mistrial and for discovery sanctions. He explained that Deputy Adragna and Detective Valerie Franco had signed search warrants for the house at 841 West 101st Street relating to the Rachal investigation, and reports suggested that Deputy Adragna had done the surveillance. Therefore, counsel had relied on being able to establish through the deputy's testimony a timeline about when the van arrived or if it was there when the surveillance team arrived. Counsel argued that he was entitled to discover who was on that team and the radio communications regarding the surveillance, but those communications had been destroyed per law enforcement policy.

The trial court agreed that the evidence was potentially relevant to the extent the surveillance team was watching the house around the time of Golden's murder and was there until Rachal and the other men exited the house. Specifically, if the surveillance team did not see anyone come to the house after the murder, this could impeach Stringer, who had claimed Jones showed up at some point. Alternatively, if members of the surveillance team were in a position to see where the van was parked, they might be able to say if it was already there when they arrived.

After additional argument, Williams's counsel withdrew his mistrial motion, stating he did not believe Deputy Adragna acted in bad faith, but Jones's counsel did not withdraw his mistrial motion. In response, the prosecutor agreed that the evidence was potentially relevant but argued it was speculative as to when the surveillance team arrived and what they saw. So "it could be a

whole lot of nothing." The prosecutor maintained that there was no discovery violation as there was nothing they could have turned over, other than the search warrant that was produced along with Deputy Adragna's report relating to the surveillance operation and Rachal's arrest. Further, there was a two-to-four hour gap where the house was potentially unwatched, from about 10:00 a.m. when Rachal was arrested and the surveillance team presumably left, to about noon or 2:00 p.m., when Deputy Adragna arrived to review the scene. Jones and Stringer could have gone to the house during this gap.

The trial court denied Jones's motion for a mistrial, stating it was not obvious anybody would have understood the evidence to be potentially exculpatory under *Brady*[14] at the time. Indeed, the trial court noted that the evidence could be incriminatory. Therefore, the trial court found that defendants' right to a fair trial had not been compromised.

Nonetheless, the trial court asked the prosecution to try to obtain additional information about the surveillance team. After further investigation, the prosecutor reported that the surveillance team was autonomous and did not generate reports. It instead reported to the investigating officer, who could put something into a written report. Based on this information, the trial court reaffirmed its ruling, stating there was nothing obviously exculpatory about the evidence "in the sense it either places or doesn't place" Jones at Stringer's house as Stringer claimed.

---

[14] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

### D. *Crime scene diagrams*

As part of processing the crime scene, Deputy Sheriff John Chun sketched diagrams of the area. He did not disclose the diagrams until just before he testified at trial, when he gave them to the prosecution, which then gave them to the defense.

### E. *The fingerprint ruse*

Early in the murder investigation, law enforcement thought a person named Davon White might be involved in Golden's murder. White came to law enforcement's attention through a woman referred to as Sarah Williams, who had told law enforcement that her boyfriend—White—may have shot Golden. In preparation to interview White, detectives concocted a ruse to stimulate him, i.e., get him to talk. They prepared a fake fingerprint report authored by "Deputy Rusenit" stating that White's fingerprint was found in the van. However, detectives never used the fake fingerprint report because they determined that White was not involved in the murder. The fake fingerprint report was in the murder book with no notation that it was fake. Defense counsel—and the prosecutors—were unaware, until during trial, that the report was fake. Indeed, Williams's counsel, believing the Deputy Rusenit fingerprint report to be real, had told the jury in his opening statement that White's fingerprints had been found in the van, thereby raising the possibility someone else, and not his client, was involved in the murder.

On discovering that the White fingerprint report was fake, defense counsel alerted the trial court. Defense counsel said he had spent hours trying to track down "Deputy Rusenit" and following leads, and that this was unacceptable. The prosecutor

17

explained that he had just learned that the fingerprint report was fake when defense counsel told him, and the prosecutor confirmed with Detective Rodriguez that the report was fake.

When Williams's defense counsel reminded the trial court that he had mentioned the fingerprint in his opening statement, the trial court said the jury would not remember that. Counsel, however, pointed out that the errors cumulatively—from late discovery to this ruse—were continuous, causing the defense to scramble and to lose credibility with the jury. Jones's counsel added that while some of the omitted discovery, like Deputy Chun's crime scene diagrams, was not significant, other omitted discovery—the surveillance team and the false fingerprint report—was having a cumulative effect of misleading the defense. Had counsel known about these things earlier, he would not have announced ready for trial. Both defense counsel therefore asked for a mistrial or, alternatively, that the prosecution be admonished and CALCRIM No. 306 be given.

The trial court expressed its frustration, commenting that discovery was "coming in fits and starts throughout trial" and it was odd that fake evidence would be in the murder book. The trial court was "frustrated" that trial was not moving along, and that "stuff just keeps coming and coming, and it's every single day." So while the trial court did not think a mistrial was warranted, "there's an awful lot of stuff coming out in drips and drabs." From the trial court's perspective, the Sheriff's Department had not effectively or efficiently investigated the case.

F. *Dismissal and mistrial motions*

After Detective Shear produced his entire file about Stringer and testified about it outside the jury's presence, both

18

defense counsel, over their clients' objections, renewed their mistrial motions. Williams's counsel gave a caveat, saying he was asking for a dismissal based on discovery violations under section 1054.5 and, alternatively, that the trial court instruct the jury with CALCRIM No. 306.

The trial court stated its view of the various discovery violations. First, there had been an issue as to Sarah Williams, whose real name was Rasheeda Williams. Sarah/Rasheeda Williams told law enforcement that her boyfriend, White, was involved in the murder, although it was unclear how she knew that. The defense had been hampered in learning her real name, so it had not been able to subpoena her in a timely manner. However, the trial court found that it was not the prosecution's fault she gave a fake name, and she was now under defense subpoena, so the trial court did not believe this to be a significant issue.

Second, as to Deputy Adragna, the trial court said that had the defense known a surveillance team was at the location, it might have, but not necessarily, led to exculpatory material.

Third, Deputy Chun showed up at trial with a folder of crime scene diagrams, which the trial court said was not a "huge issue," even though the trial court was incredulous that a deputy who processes crime scenes would not think to turn over all of his notes.

Fourth, there had been a late disclosure of Detective Shear's file about Stringer, although the trial court did not think there was anything earthshattering or exculpatory in it, except that Stringer was facing drug charges and had provided information on an unrelated murder, which issues could go to his credibility. The trial court's concerns about whether the defense

19

had notice about Detective Shear were allayed when the prosecutor pointed out that the defense had been timely given an email from Detective Shear to Detective Rodriguez stating that Detective Shear had arrested Stringer in 2015 and "he provided the information I gave to Mike on the LASD homicide." The email also said that Stringer had provided information about other shootings but, as far as Detective Shear knew, Stringer had not been signed up as an informant.

The fake fingerprint report was the final "frosting on the cake" and was of the greatest concern to the trial court because it had misled defense counsel, who had referred to it in his opening statement.

Notwithstanding these issues, the trial court said it did not believe that the prosecution was involved in any of this, so it would not dismiss the case, even while expressing disappointment in how the Sheriff's Department had handled and documented the investigation. The trial court said that if the defense really wanted to continue trial, "and if the defense is willing to state on the record that it has considered all the discovery in the case, the evidence presented thus far in trial, and the way the trial has gone, and that it is making a tactical decision based upon all of that, and after consultation with their client[s] that they are withdrawing the motion for mistrial in exchange for instruction, I will consider continuing" trial and giving an instruction about the Rusenit report, Deputy Adragna, and Deputy Chun.

It added that if defense counsel were willing to formally withdraw the mistrial motions and state it was a tactical decision to do so based on the state of the case, review of the evidence, and after talking with their clients, then the trial court thought that

20

would protect any verdict and the People against double jeopardy if the jury hung. The trial court said it was guarding against being "whip sawed," where if it did not grant a mistrial and defendants were convicted and "it's reversed because I should have. Or, you know, I do grant a mistrial, then there's a double jeopardy argument because the defendants didn't want it." So, the defense "has to decide what they want in this case. If you want the instruction, you have to withdraw[ ] the mistrial [motion]. If what you want is the mistrial, make the motion. And I want you to talk to your clients about it."

After talking to his client, Williams's counsel elected to have a "strong admonition" and to waive any ineffective assistance of counsel claim regarding investigation, preparation, and "towards my specific joining in him." However, when the trial court refused to give CALCRIM No. 306 immediately, counsel declined to join with his client, and moved for dismissal, which motion the trial court promptly denied. After further discussion, Williams's counsel withdrew his mistrial motion and asked for the instruction, with Williams personally waiving his right to appeal on the ground the fairness of his trial was hindered by the late discovery in specific areas (the fake fingerprint report, the Adragna report, and the Chun diagrams).[15]

Jones's counsel, after consulting with his client, also made a tactical decision to withdraw the mistrial motion, with the caveat that the instruction on late discovery might need to be expanded beyond the indicated areas depending on the state of the evidence. Jones personally agreed, with the understanding the jury would be instructed with CALCRIM No. 306. The trial

---

[15] Later, the trial court added the cell phone analysis report to CALCRIM No. 306.

court asked Jones if he understood he was giving up his right to claim ineffective assistance of trial counsel on this issue and to complain on appeal about issues of fairness related to the three areas of discovery. Jones agreed, and counsel concurred.

Later, after the defense rested, both defense counsel withdrew any motion for a mistrial based on the untimely disclosure of discovery, stating that they were making a tactical decision to rely on CALCRIM No. 306.

The trial court accordingly instructed the jury that the People had failed to disclose five categories of evidence within the time limits set by law, and that the failure "may deny the other side the chance to produce all relevant evidence to counter opposing evidence, or to receive a fair trial." The five categories of evidence the People had failed to disclose before trial were: (1) that the fingerprint report identifying a finger or palm print from the white van as belonging to Davon White was a ruse; (2) that surveillance of Stringer's home on March 31, 2015 was not conducted by Deputy Adragna or deputies working with him, but by a special fugitive apprehension team, whose members and activity on that day can no longer be ascertained; (3) Deputy Chun's crime scene notes and diagram; (4) Agent Easter's cell phone tower report; and (5) that the district attorney's office and Sheriff's Department gave Stringer relocation funds after Stringer testified at the preliminary hearing. The jury was further told that in evaluating the weight and significance of the evidence, "you may consider the effect, if any, of this late disclosure."

II.     General discovery principles

Timely pretrial discovery promotes ascertainment of truth and prevents trial by ambush. (§ 1054, subd. (a); *People v. Bell*

(2004) 118 Cal.App.4th 249, 256.) Discovery in criminal cases is per California's statutory scheme, unless otherwise mandated by the federal Constitution or other statutory provisions. (§ 1054, subd. (e).) The statutory scheme requires the prosecution to disclose information in its possession or information it knows to be in the possession of investigating agencies. (§ 1054.1.) Information that must be disclosed includes names and addresses of witnesses the prosecutor intends to call at trial, the defendants' statements, a material witness's felony conviction, exculpatory evidence, and relevant written or recorded statements or reports of witnesses the prosecutor intends to call at the trial. (§ 1054.1, subds. (a)–(f).) Disclosures must be made at least 30 days prior to trial or, if the prosecution obtains discovery within 30 days of trial, immediately. (§ 1054.7.)

If a party fails to comply with its discovery obligations, a trial court may issue any order necessary to enforce the discovery statutes, including immediate disclosure, contempt proceedings, or a continuance. (§ 1054.5, subd. (b).) Alternatively, section 1054.5, subdivision (c), preserves judicial power to dismiss the action for a *Brady* violation. (*People v. Gutierrez* (2013) 214 Cal.App.4th 343, 352.) Under *Brady*, and notwithstanding any statutory discovery duties a prosecutor has, the prosecution has a constitutional duty to disclose evidence favorable to the defendant and material on either guilt or punishment. (*In re Sassounian* (1995) 9 Cal.4th 535, 543–544; see also *In re Brown* (1998) 17 Cal.4th 873, 879 [prosecutor's duty to disclose material, exculpatory evidence extends to the prosecution team, including investigative agencies].) Evidence may be favorable if it helps the defendant or hurts the prosecution by, for example, impeaching a witness. (*Sassounian*, at pp. 543–544.) Evidence is

material if there is a reasonable probability that had the evidence been disclosed the outcome would have been different. (*Ibid.*; see also *People v. Zambrano* (2007) 41 Cal.4th 1082, 1132–1133 [materiality includes whether nondisclosure impacted defense investigation and trial strategy].) If confidence in the outcome has been undermined, then a reasonable probability exists. (*People v. Dickey* (2005) 35 Cal.4th 884, 907.)

Generally, we review a trial court's discovery rulings for abuse of discretion. (*People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1212.) But where the issue is whether dismissal was proper under section 1054.5, subdivision (c), our review is de novo. (*Ibid.* [§ 1054.5, subd. (c), forbids dismissal as discovery sanction unless federal Constitution requires dismissal].)

III.   No *Brady* error occurred.

Primarily citing section 1054.5, subdivision (c), Jones contends that the trial court erred by failing to dismiss charges under that section. As we have said, dismissal under section 1054.5, subdivision (c), amounts to a claim dismissal is required because of a *Brady* violation. (*People v. Gutierrez, supra*, 214 Cal.App.4th at p. 352.) Jones thus focuses on the prosecution's failure to provide discovery about the surveillance team, claiming this was *Brady* error.

To establish that the failure to provide discovery about the surveillance team violated *Brady*, Jones had to show three things: first, the evidence was favorable to him because it was exculpatory or impeaching; second, the State suppressed it, either willfully or inadvertently; and third, prejudice. (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282; *People v. Salazar* (2005) 35 Cal.4th 1031, 1043.)

Jones did not make the first showing, because a mere possibility that evidence might have helped the defense or affected the trial's outcome does not establish materiality. (*United States v. Agurs* (1976) 427 U.S. 97, 109–110; *People v. Fauber* (1992) 2 Cal.4th 792, 829.) Here, Jones theorized that members of the surveillance team would have been able to impeach Stringer's testimony that Jones arrived at his house around 10:00 or 11:00 a.m., sometime after Golden was killed at about 8:30 a.m. That is, the surveillance team could have testified either that they did not see Jones arrive at the house that morning or that the van was already there when they arrived.

However, Jones's theory depends on several things. It depends on when the surveillance team arrived at Stringer's home. If the team arrived later in the morning, it may not necessarily have seen anyone arriving at the house. The surveillance team may have seen nothing because Jones and Stringer could have been at the house sometime after the surveillance team left around 10:00 a.m. Jones's theory further depends on whether the surveillance team had a vantage point such that it could see all entry points to the house. Moreover, the evidence could have been incriminatory: the surveillance team could have established that the van arrived soon after Golden was shot and that Jones went into the house. Indeed, there was evidence that four Black men ran out of the house with Rachal, one of whom could have been Jones. Thus, the evidence could have corroborated rather than impeached Stringer's statements. That the evidence was exculpatory was therefore speculative.

Although we need not proceed to the next element, because a defendant claiming *Brady* error must establish all three

elements, Jones also cannot establish that the State suppressed the evidence. First, the surveillance team was watching Stringer's house in connection with an unrelated matter. It was happenstance that things occurred at that house possibly relevant to Golden's murder. It was not readily apparent that what the surveillance team did was relevant to this case. Second, the prosecution did disclose Deputy Adragna's search warrant for the house and his report. While those documents did not refer to the surveillance team's existence, it is unclear what other discovery the prosecution could have disclosed on this matter, because the surveillance team itself wrote no reports and any radio communications were destroyed per departmental policy. And while the detective investigating Golden's murder perhaps should have included in his report information about the surveillance team, the relevance of that team understandably may not have been readily apparent. Rather, from the detective's perspective, what was relevant was that Deputy Adragna saw the van involved in Golden's murder. We therefore do not agree that any failure to disclose evidence about the surveillance team violated *Brady*.

IV. The discovery violations did not violate Jones's constitutional rights.

Jones urges us to consider the cumulative effect of the discovery violations in combination with the alleged *Brady* error and find that his due process rights, constitutional right to a fair trial, right to effective assistance of counsel, and right to present a meaningful defense were denied.[16] He therefore argues that

---

[16] The cell phone analysis report, Deputy Chun's diagrams, the fingerprint ruse, and Stringer's receipt of relocation funds

26

dismissal or mistrial was required in the furtherance of justice under section 1385. We do not agree.

To the extent the denial of discovery implicates a defendant's federal due process rights, the applicable test is whether the error is harmless beyond a reasonable doubt, under *Chapman v. California* (1967) 386 U.S. 18. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961.) Otherwise, a prosecutor's violation of discovery statutes is subject to reversal when it is reasonably probable the outcome was affected, under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1135, fn. 13.)

Under either standard, reversal is not required. While Deputy Chun's failure to produce the diagrams until trial leaves us as incredulous as the trial court, there was nothing remotely earthshattering about them, because they corresponded to what the crime scene photographs already depicted. Nothing that the diagrams showed impacted the ability to put on a defense, and neither below nor on appeal does Jones argue they did. Indeed, trial counsel for Jones agreed they were not "significant" by themselves but only became so when considered cumulatively with the other untimely discovery.

Nor can we agree the untimely disclosure that Stringer was given relocation funds harmed the defense. Through its examination of Detective Rodriguez, the defense ably impeached the prosecution's case by establishing that he gave Stringer those relocation funds. Also, the detective gave those funds to Stringer

---

were not suppressed and therefore could not form the basis for *Brady* error. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467 [matters presented at trial cannot form basis for *Brady* error].)

after Stringer testified at the preliminary hearing, and therefore, as the trial court noted, those funds could have had no impact on Stringer's preliminary hearing testimony. The defense was also able to impeach Stringer's credibility in other ways. Although Detectives Rodriguez and Shear testified that Stringer was not an informant, defense witness Sergeant White testified that Stringer was an informant from 2013 to about April 2014. Sergeant White did not financially compensate Stringer, but he did not present ammunition and drug possession charges to the district attorney's office. Therefore, the defense did show that Stringer had connections to law enforcement and might want to trade information—true or manufactured—for help on pending charges or for other assistance.

As for the cell phone analysis report, we agree with the trial court's observation that things fall through the cracks and that the prosecution's late disclosure was not intentional or malicious. However, that report and designating a witness to testify about it were key to the prosecution case. Yet, the two prosecutors assigned to this case failed to produce the report *and* to distribute the expert designation, although they had it prepared. Defense counsel announced ready for trial and based strategy in part on their understandable belief that the prosecution was not going to use the cell phone evidence to place defendants in the vicinity of the crime scene before and around the time of the murder. We therefore are not so sanguine about the omission.

While we cannot condone such prosecutorial sloppiness, it nonetheless did not fatally harm the defense, in part due to the competence of Williams's defense counsel, who had already retained and consulted a cell phone expert, and of Jones's

counsel, who was able to use the same defense expert. Moreover, the trial court did offer a continuance, but Jones's counsel declined the offer, stating he was prepared to go forward and that a continuance would not make a difference in his ability to counter the new evidence. Given this representation that the late disclosure did not impact defense counsel's strategy, we cannot find that the untimely disclosure impeded Jones's ability to get a fair trial or that the outcome would have been different.

Next, the prosecution similarly had the defense to thank for the Deputy Rusenit debacle coming to light during trial. It was only due to defense counsel's thorough attempts to track down Deputy Rusenit that the ruse was unveiled. Until it was, the fake fingerprint report led the defense, as well as the prosecution, to believe that third-party White's fingerprint was in the van, when in fact it was not. Notwithstanding the error, we cannot agree that the defense was ultimately harmed. To the contrary, Detective Rodriguez had to fall on his sword before the jury, admitting his failure to note that the White fingerprint report was a fake and was a "big mistake." This must have led the jury to wonder what other mistakes had been made (which CALCRIM No. 306 answered), even if those mistakes were not enough to convince it to acquit Jones.

We therefore reject Jones's argument that reversal is required, even though we acknowledge this was not, in his words, a slam dunk case. There were no witnesses to the murder; Jones's prints were in the van, but it could not be ascertained when they were placed there; and although Jones made seemingly incriminating statements in the wiretapped calls, those statements were cryptic and fell short of an admission he was the shooter. Also, Jones offered a reason why his cell phone

was in the area at the time of the crime: his girlfriend lived in that area, and he used to babysit her daughter.

Even so, and as we have said, to the extent this case hinged on Stringer, the defense was able to attack his credibility. The defense brought out that Stringer was a repeat felon facing yet more criminal charges when he gave his statement incriminating Jones. Stringer was clearly hoping for consideration in exchange for helping law enforcement, and Detective Rodriguez said things to Stringer suggesting he could help him. Indeed, the detective did give Stringer over $5,000 in relocation funds. And at the preliminary hearing, Stringer admitted that he could have "put a little extra on some things" in this case, implying he could have exaggerated.

Aside from the fact the defense was not critically impaired in its ability to attack Stringer's credibility, Stringer's statement was also corroborated in part. He said that No Good came to his house and that when the police arrived, they escaped out the back. Stringer therefore knew that police were at his house that day. Also, he said that No Good referred to the victim as "the old guy." Although not elderly, Golden was 47 years old when he was murdered.

We therefore conclude that the discovery violations were harmless.

V.    The waiver of rights

Jones's final contention is the trial court improperly required him to waive his right to raise on appeal claims of ineffective assistance of counsel and violation of his right to a fair trial as a prerequisite for having the jury instructed with CALCRIM No. 306. Despite our doubts regarding the propriety of conditioning the giving of a proper instruction on the waiver of

such rights, we need not consider the issue. Our reading of this record shows that even if the trial court did improperly impose such a condition, both defense counsel, after resting, were crystal clear that they were withdrawing any motion for a mistrial based on the untimely disclosure of discovery and making a tactical decision to rely on CALCRIM No. 306. Stated otherwise, given the state of the record, defense counsel made the strategic and wholly reasonable decision that their best chance for a good outcome was before a jury that had seen firsthand the law enforcement and prosecutorial missteps and getting a strong instruction about them. Therefore, the record is clear that Jones was not forced to give up rights to obtain the instruction; rather, the instruction is exactly what he wanted.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

ADAMS, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.